May it please the Court, Joseph Bailey for the Lead Plaintiffs Appellees. I'd like to reserve three minutes of my time for rebuttal. Your Honors, this morning, given the sheer amount of materials, 200-page complaint, 430 paragraphs of allegations, I'd like to focus on just two of the misleading statements and omissions that we've alleged against Ernst & Young. First, the misleading omission from the 2000 audit opinion as to the substantial doubt as to IndyMac's ability to continue as a going concern. And second, in Ernst's affirmative misstatement, appearing in both of the audit opinions, that IndyMac maintained effective internal controls over its financial reporting. Now, that omitted going concern qualification, which was omitted just a few months prior to the bank being seized and IndyMac itself declaring bankruptcy, that was... In February 2008, IndyMac was then at risk of falling below the maximum minimums in March, and five months later, then OTS took over the bank. Is that what you're talking about? Exactly. OTS took over the bank. FDIC came in. Then Indy declared bankruptcy. And then Indy declared bankruptcy, yes. But we're not necessarily looking out at the five months in the future. We're looking at what confronted Ernst & Young as they were doing its audit. And at that point, they were supposed to look through the five factors under the accounting and auditing guides, recurring losses, liquidity problems, strained relations with government regulators. And here's what was confronting them at the time. IndyMac had just gone through two consecutive quarters of substantial net losses, $203 million in the third quarter of 2007, more than doubling to $509 million in the fourth quarter of 2007. The OTS, the Office of Thrift Supervision, had begun its examination of the bank four months early because of OTS's concerns that IndyMac wasn't fundamentally sound. Is this the disregarded information you suggest they had a duty to review? Of course they had a duty to review. As auditors... Audit is my question. In your complaint, you say that the Ernst & Young had to... They disregarded information it had a duty to review, but you never say what in your complaint. And so I wondered what it was you were saying they disregarded information that they had a duty to review. Well, as I was saying, under AG, and I'm going to give you the exact... AHE 5.108, they were supposed to look at five primary factors that went into the going concern qualification. So you're talking about every one of the five factors? Every one of the five, and every one of the five existed at that time. If I compare your allegations that you make in this particular claim with the allegations of those in NM, you know what I'm talking about in NM? New Mexico v. Ernst & Young. Seems to pale in comparison, doesn't it? Well, every case is different, Your Honor, stating the obvious. We're really looking, aren't we, when we're looking at this, about scienter. That's what you're really talking about, aren't you? We're not really talking about the falsity when you're talking about what they disregarded. You're talking, if I understand it, about the scienter that you would need to prove or at least allege. It would be both. I mean, the audit opinion, the fact that it omitted the going concern, that made the audit opinion itself false. But turning to the scienter allegations. Well, I'm talking about false. If you're back on falsity, I guess it's of some worry to me that an auditor has a responsibility to evaluate when there is substantial doubt about the entity's ability, and I'm quoting, to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the audit. But then on the other hand, I have this idea that the auditor's evaluation is based on his or her knowledge of conditions and events that exist at or have occurred prior to the date. It seems to me that when I put those two together, I can effectively say that there are no bright line rules on that. Would you agree? I would agree with that 100%. And so then one must show that the situation must have evidence substantial doubt as to the continuity of IndyMac. Agree with that as well. Agree with that as well. And if I could tell, Your Honor, some of the factors that were confronting Ernst & Young at that point. You know, one of the troubles in this area is, especially with these kinds of organizations, it seems, if the auditors came out prematurely and said, we doubt this organization is going to go on existing. That's if that's too soon. It seems to me that's asking for a run on the bank. Indeed, I believe at one point there was a run on the bank after somebody made some sort of statement. So it said it was a great run on the bank. Isn't there a problem there? And if you're talking about negligence, you're talking about say enter. Isn't there some sort of difficulty there in it? If the auditors had said it and it wasn't quite yet right and true, I think we'd have a different lawsuit in front of it. But we would have a lawsuit in front of it. Perhaps a lawsuit from IndyMac against its auditors. From the shareholders. The shareholders got destroyed. Auditors always have to temper with what they see in front of them and use their judgment in deciding whether to issue a qualified audit opinion or an unqualified audit opinion. But the fact that there's some tension there, the fact that they have to temper the two, doesn't give them carte blanche to ignore the obvious, what's in front of them. At that point, the Office of Thrift Supervision had come in and had told IndyMac that they were downgrading its camels rating from a two to a three. They were downgrading its assets rating from a two to a four. A four, Your Honors, means that IndyMac is in a deteriorating position. I mean, that's very clear. Well, but if we take the OTS downgrade of IndyMac's composite camel rating to a three, your opponent notes, and that's brief, that OTS uses a three to indicate, and I quote, failure appears unlikely given the overall strength and financial capacity of the institution. Two responses to that. Number one, a three also means that there are moderate to severe weaknesses. So OTS is coming in and saying you have moderate to severe weaknesses overall in your composite camel. But as I also said – We're talking about now the continuity, as I understand it. You're on the false omit of continuing concern qualification. And if I look directly at the three, it says, failure appears unlikely given the overall strength and financial capacity of the institution. So even the OTS would have agreed with EY. And I said I had two responses. Actually, I'm going to have three. My second would be different standards apply, and this is in our brief. I hear you. I read your brief, but I didn't know whether you really responded to that argument, which looked pretty tough for you. And my third point, which I believe is also in the brief, is that the Office of Inspector General, when they came in after this entire debacle, their report on the entire thing said, we cannot believe that OTS allowed this organization to continue. We cannot believe that you didn't go in there in 2005 and institute an enforcement action. It worries me a little more. When I add OTS's downgrade and what it really means to me, and I add to it the fact that IndyMac had suffered losses in the third and fourth quarters but enjoyed profits in its second quarter, and IndyMac did not actually fall below the regulatory threshold until one month after the clean audit, then I say to myself, I'm having a tough time with the scienter part of this and the falsity part of this. Let me try to ease the tough time a little bit. The standard is recurring operating losses. They had enjoyed quarter over quarter of profits. That's true. Third and fourth quarter of 2007, everything just fell apart. $200 million in one quarter, $500 million in the next. And you also mentioned the well-capitalized. The only reason they were well-capitalized as of the first quarter of 2008 was because IndyMac actually went to the Office of Thrift Supervision and said, would you please let us change the calculation method? And the Office of Thrift Supervision allowed them to do that. If they had not done that, they would not have been well-capitalized at that point. And your honors know what happens, it's throughout the briefs, what happens when they go from well-capitalized to merely adequately capitalized. That drives a dagger into the heart of the core of their business. And I understand that. I guess the last inference, and to me may be more compelling than Sinter, is that if I had been in EY's position, or just making the argument, considering the facts, they decided, either accurately or negligently, rather than falsely, that there was not a substantial doubt that IndyMac was viable and exercised their judgment then to leave out the going concern qualification. I mean, that's the question. You've got to go more than negligence here. You've got to say it's false by what happened here. And why I tried to point it out to you, it seemed to me that there were no bright-line rules. We had to look at the situation that was there. And then we had to look at what the facts were that might support it and might say against it. And then one's got to say, that's fraud. And I agree 100% with you, your honor. And that is something that the Supreme Court said in Tel Aviv. That is something that this Court has said in South Ferry. It's a holistic analysis. You look at all of these factors taken together. Any one of them, on their own, perhaps doesn't push the ball over the line. But that doesn't matter under Tel Aviv. It is looking at everything together. Now, this is not the New Mexico versus Ernst & Young. This isn't a $2.3 billion restatement. But even there, this Court – You were going to – sorry, you were going to talk about the internal controls. And I just want to ask you a little bit about that. I mean, it seems like looking at your complaint, it's the Fifth Amendment complaint, it looks like there are a lot of specific facts that you allege regarding IndyMac. When I look at the complaint, though, and see whether there are specific facts that support the claims that you make with respect to Ernst & Young, I have a little bit of trouble because – and you mentioned internal controls. With respect to the internal controls, it looks like there were facts that show that – or allege that show that maybe there were weaknesses with the conduit division. But I'm not quite sure that that rises to the level of being material. But I'd like to give you an opportunity to convince me. Of course, Your Honor. And how it reflects general overall, that that should have been a sign for Ernst & Young. Well, it's very material. The conduit division was responsible for fully one-third of IndyMac's loans. And 30% of the loans within the conduit division had debilitating defects. In fact, that division led to an 18% loss in net income for 2011 alone. What's important, putting that conduit division up against Ernst & Young, Ernst & Young actually audited that division back in 2006. And in its own audit, and on the heels, I might add, of another IndyMac internal audit the same year, found that the division suffered from deficiencies in controls over financial reporting. That didn't change. The Office of Thrift Supervision came out a year later and said nothing has changed in that division. The controls, the defects in the financial reporting controls were never fixed. Now, the division went under, and it was closed in fall of 2007. But that closure by itself did not excuse Ernst & Young from considering the lack of internal controls and their effect over the entirety of IndyMac's numbers. Why? It seems to me that in issuing the 2007 report, the conduit division was closed, and so I'm having a tough time understanding how the problems in that division could be a problem for EY in that particular year. As I just said – I can see where you go with 2006. I can see your argument. But I'm still having a tough time with 2007. Well, I believe I said that those loans out of that division ended up becoming part of the 18% net loss for IndyMac overall for 2007. So even though the division itself closed three-quarters of the way into the year, the bad loans coming out of that division continue to affect IndyMac's overall financial results for the entire year. So they don't get a pass just because fortuitously the division closed three-quarters of the way through the year. And that is something the district court thought was important. Well, the court thought these were very strong allegations, but for the fact that the division ended up closing, and that was the wrong focus. The focus is on IndyMac's financials overall. Now, you're about to use your time, but I want to ask you one thing about that. If EY itself reported the problems in the conduit division in 2006, I'm having a tough time with Sienter, because that seems to suggest that they knew the problems were out there. They disclosed the problems to everyone, but they made a conscious professional decision that even given these problems, they did not see this as a, quote, unquote, material weakness, as that term is defined. So I guess I'm trying to figure out why that is Sienter of fraud. They tell you what the problem is. They evaluate it as a professional. They put their opinion out there and say that doesn't make it, and now you want to suggest that's fraud. But you said something there, Your Honor. You said they tell you that. They didn't tell anybody. That's the point. They reported the problems with the conduit division. They reported it internally to IndyMac. So, therefore, they knew about it. All the more reason that they also should have reported that publicly. And now knowing about it, they know what it is, and they make their report nonetheless. And they know it's there, and that puts upon them a duty of heightened scrutiny as the year continues, and nothing had changed by the end of the year. I'm not saying that. The Office of Thrift Supervision said that. Okay. Thank you. Thank you. You've used your time. May it please the Court. Miles Ruthberg for Defendant Appelee Ernst & Young. Your Honor, successful securities fraud pleadings against outside auditors are very rare, and this case demonstrates why. The complaint has voluminous allegations about the company and has nothing to show knowledge or deliberate recklessness by Ernst & Young. The district court gave very careful consideration to this case, and there are multiple grounds on which the court ruled and multiple grounds on which this court should affirm, any one of which would be sufficient. The district court gave the plaintiffs five opportunities to amend their complaint, and there is simply no basis for a fraud claim here. In fact, no one other than the plaintiffs here have even attempted to assert any claim against Ernst & Young regarding the failure of IndyMac. The SEC investigated. The FDIC investigated. The trustee of IndyMac investigated. The complaint acknowledges and indeed touts all of that, but those folks all brought claims against company officers or directors, not against Ernst & Young, not even for negligence. The complaint nonetheless features those other complaints brought by other people against other parties and tries to bootstrap those into a claim against Ernst & Young. Let's talk about the going concern. How could Ernst & Young's omission of that going concern, I think it was in 2007, not have been material? Misleading omission when IndyMac apparently went into receivership and filed for bankruptcy only about five months later or less than six months later? Your Honor, we all lived through that period of time, and I think we all can recall how things changed very rapidly and in ways that perhaps none of us predicted. A judgment on going concern is one of the most judgmental things that an auditor does. It's a judgment that's made on the facts and circumstances as they then exist. I do think the very key fact is what Judge Smith pointed out, which is the United States government regulator in charge of regulating IndyMac a few weeks before Ernst & Young's own opinion itself concluded that IndyMac's failure was unlikely. These are judgment calls. These are not the stuff of falsity. It's an opinion statement as to whether or not IndyMac was likely to continue as a going concern.  That's an opinion. You need to show a lot for that even to be false, let alone for that to be false with scienter. And the government's own conclusion on that we think speaks volumes. I can debate about the underlying factors that existed at that time, argue about each of the five. Well, we have that, and then we have that Ernst & Young signed off on IndyMac's allowances for loan allowances, and that's, I mean, in light of the Office of Thrift Savings' later identification of gross capital inadequacy at IndyMac, why isn't that indicative of false misleading or deliberate recklessness, I guess? Again, Your Honor, it's all a question of the time sequence. And the amount of reserves that IndyMac was recognizing was increasing dramatically during 2006 to 2007, as the complaint itself acknowledges. That was an estimate being made by IndyMac of the losses that were likely to occur. That itself was a judgment based on the facts as they existed. Ernst & Young was then making a judgment about the judgment, and that's why it's especially difficult to say that the audit opinion was false, let alone that it was false and done with scienter. And it's telling, I think, that plaintiffs don't try to emphasize the reserve issue here in light of all the case law from around the United States, saying, yes, in theory, you can plead a securities fraud complaint about reserves, but that's very judgmental. I mean, recently the Second Circuit in the Fate case concluded that that is such a judgmental area, it is itself an opinion, and you have to show subjective disbelief, et cetera, et cetera, for it even to be false. Let alone something that would rise to the level of scienter. So reserves, very, very difficult, easy to second guess in hindsight, and what you see here is a record of the reserves increasing over time. And in hindsight, you can say it didn't increase fast enough, but that's a judgment call. Well, I guess as long as we're on loan loss reserves, I'd ask you a couple of questions. As you know, I had something to do with Metzler. Yes, sir. And I also know a little bit about Dow. I call it Dow. I don't know what a good lawyer calls it, but that's what an Idaho kid calls it. And both of us in both decisions relied on Dura Pharmaceuticals in making our decision. Yes, sir. But Dura Pharmaceuticals says that all that the plaintiff needs to do is provide a defendant with some indication of the loss and the casual connection that the plaintiff has in his mind. Now, as to loan loss reserves, which is a worry to me, frankly, you may not like what Cody pled, but I'm having trouble determining how you can't say that Cody didn't give you some indication of the loss and the causal connection they had in their mind. Yes, sir. And we all call it Dow as well. Your Honor, Metzler is a pleading case, as Your Honor knows, and not a summary judgment case. Right. And Metzler says that you can't plead by euphemism. And so I think here it is, I will acknowledge it is harder to judge the causation issue here than it is to judge scienter, which we think is crystal clear. And falsity is also quite clear on a number of these items, if not all of them. Frankly, scienter is the one we believe is the absolute clearest because the pleading standard is, as Metzler says, formidable. And in Metzler, the court emphasizes that was a case against company officials, not outsiders. And in Metzler, the court says even with company officials, even where you have confidential witnesses and even where those witnesses are in the room, and say that the officers knew there were accounting issues, knew there were disagreements about them, but you don't have evidence that people thought it was wrong or suspicious. And therefore, that's not scienter. And so we say our case is easily clearer than Metzler with an outsider. What about Dow? I mean, in Dow, $10 million in unbilled receivables did not necessarily indicate fraud. But it did. Against? Sorry. Didn't then Dow reject the idea there has to be a revelation of actual fraud? Yes, sir. For causation purposes, that's absolutely true. For scienter purposes, Dow is not against an outside auditor and doesn't change the unbroken line of authority in the Ninth Circuit. DSAM, again, in DSAM, you have not only access to the documents, but you have the court saying that the auditor actually had the documents in his hand, but the documents didn't clearly indicate an error or a fraud, and that's not enough. Here, you have the plaintiffs talking about documents that the company had and saying Ernst & Young had access to them, should have looked at them. And therefore, that's enough for scienter, and you cannot reconcile that with DSAM or the NM case or Metzler, or Dow for that matter, which is a company about insiders. On causation, Your Honor, and to come back to that, we do believe that Judge Wu was correct about that, because if every time a company announces an increase in its reserves, that is enough to plead by euphemism, we would say, that that means prior reserves were false, then there's a securities fraud claim against every company in the United States that changes its estimates on a going forward basis. And we would say that can't be the law, but we would acknowledge that causation is not subject to the particularity standard and is perhaps a closer question here than scienter because of that. When I was deciding Metzler, we said, there's nothing that alleges that between June 24 and August 2, there were any announcements that disclosed or even suggested the market that Corinthian was manipulating the enrollment figures. Right. Here, quite the opposite. Cody does allege there were increases in loan loss reserve. They were disclosed. And now he says that's fraudulent. If I am to give the plaintiff the benefit of his doubt on his complaint, then how can I say that that's insufficient? It may turn out right. It may turn out wrong. But why is it insufficient? It's insufficient, Your Honor, because it inheres in the nature of estimates, which are judgments that are changed as time goes by, and that's what reserves are. And companies have a lot of estimates in their financial statements, and if they increase an estimate based on the then current conditions and announce that, and if that means that's a sign of falsity and fraud with respect to prior estimates, that's a very strong rule against companies. That's what I understood to your colleague. I guess I was trying to know how I could then differentiate what we said in Metzler with this, because there's no question there was a pleading and no question of specific amounts. In Metzler, there was nothing. We didn't have anything to look at. But here, there's no question there's a pleading. No question they're suggesting it. Now, all you're trying to get me to say is, even with that, it's not enough. I've got to have what? How is Cody ever going to have any ability to say any more than what Cody said? That's the question. It doesn't have to be pleaded with particularity, but there has to be some corrective disclosure, that's what's required, right, that indicates that what was said in the past was false, and here the supposed corrective disclosure is an announcement that we're going to increase reserves going forward based on current conditions. That's the legal issue. It's an issue of first impression in this circuit as far as I know, Your Honor. But we would say if the rule is that if you change your estimates, it means what was said in the past is false, you have an automatic falsity claim against every company, let alone outside auditors, but every company that does that. So, you know, if I could, Your Honor, let me just return to Scienter, because I want to emphasize what Your Honor has already pointed out about the NM case, which is the NM case, in the course of finding Scienter, points out that it is very hard to plead Scienter against an outside auditor, because outside auditors have more limited information than the company, and an auditor exercises complex and subjective professional judgments that courts are usually not in a position to second guess. This case is a classic in that regard. You've got an opinion on an opinion in the form of the reserve issue. You've got the going concern issue, which is highly, highly judgmental. And you've got a judgmental issue as to whether weaknesses in internal control are just deficiencies on the one hand or rise to the level of material weaknesses. And in contrast to the NM case, where the court had in front of it specific e-mails, specific evidence that the auditor had developed suspicions about the accounting and yet nonetheless signed off in multiple years, notwithstanding that, there was evidence of invalid documentation that was invalid on its face, according to the court, and much more. And the court then concludes and looks at this and says, looking at this holistically, these are in-your-face facts that cry out, quote, unquote, in support of Scienter. And we would say there are no facts in this case, holistically or otherwise, that in your face cry out or even whisper about Scienter on the part of outside auditors who are not the company, who are not looking at the company's operations on a daily basis, but who are outside and are coming in at the end of the year and doing an audit. So we think this pleading actually falls far short on Scienter. And, in fact, we don't believe a finding of Scienter here could be reconciled with DSAM, Metzler, Zucco Partners, or the type of things that were found in NM. I think with that, unless there are questions, I guess on going concern, I've tried to cover that, and I just think on its face the government's own conclusion a few weeks earlier is impossible to square with a conclusion that Ernst & Young acted with Scienter. And there's certainly nothing particularized, pleaded on the internal controls point. The fact that Ernst & Young pointed out deficiencies in 2006 is a contraindicator of Scienter. There's kind of a word game that goes on. It's like they saw it, they pointed it out, and then somehow it wasn't fixed at the time they pointed it out. Well, right. They saw it, they pointed it out in 2006. The division was then closed before their next audit opinion in 2007. So there's no repeated notation of this by Ernst & Young, no failure of the company to respond to Ernst & Young in between its two audit opinions. There's just no substance to that allegation. And it really comes down to a bunch of internal company reports that are discussed in the complaint, but there's no evidence that Ernst & Young even saw those, let alone that Ernst & Young had a suspicion that this showed that the accounting was incorrect. Thank you very much. Your time has expired. And your time has also expired. You went into the red. I'll give you 30 seconds. The reserves, Your Honor, I would ask the court to look at Excerpt of Record, page 213, paragraph 274. When you look at the numbers in that chart, that is a stark picture of the increasing number of losses, non-performing assets, et cetera, that IndyMac was facing at the time, and Ernst & Young signed off on those financials. In 2006, the government came out with a risk alert and said to auditors around the country, housing market's imploding, you need to take a look at directional consistency. Thank you, Your Honor. Thank you very much. We appreciate your arguments, both of you. Thank you very much. This is Case 12-56216, Cody v. Ernst & Young, and it is now submitted.
judges: Fernandez, Smith, Murguia